We'll hear the next case, United States v. Marley. Matthew Brissenden for Mr. Marley. I think that at the heart of this appeal, there are sort of two core legal issues that are presented. The first is whether, in the context of a Franks hearing, a district court judge may consider supplemental information in support of probable cause that was not presented to the issuing magistrate. And the second sort of central issue is how do we handle a situation such as this one, where it is alleged that illegally obtained information served as sort of the seed or the springboard or the trigger which initiated an entire investigation. What is the remedy under those circumstances? Addressing the first issue first, I think the answer is relatively straightforward. I think it's supplied by this Court's holding in the United States v. Al-Adalah. Let's assume we agree with you, Mr. Brissenden. Okay. Take the 614 number evidence off the table because of Al-Adalah. Right. Why wouldn't there still be probable cause if an agent looks at four calls or analysis is done of four calls that sees a pattern, and then they do an undercover call where he throws out an unknown name, the guy switches his name, says, oh, are you Philippe? And then when the undercover says, I have 100 to give, the person on the other end of the line agrees, when he comes back from Cleveland, to meet with him. Why wouldn't that, why wouldn't there be a substantial chance or probability of criminal activity where someone responds to something like I have 100 to give with I'll meet you when I come back from New York after believing it's someone that he knows? There may be other explanations, obviously, to that, but that's a rather suspicious response. Starting with the pattern, because I have to address not to try to divide and conquer, but I need to address each in turn. But starting with the, this notion of a pattern, what's notable is what came out in front of the district court judge was substantially different than what was presented to the issuing magistrate. The issuing magistrate is told there are multiple calls over a multi-week period, and that is supposedly the pattern that's at play when they obtain the order. Suddenly, they appear in front of the district court judge, and now they're caught, and it turns out that there are only four calls over the course of two days. And suddenly, this becomes a pattern. Alito, paragraph 11, they said this was the 448 cell phone number was from an analysis of call patterns derived from a pen register. So they just identified it, at least in that paragraph, as an analysis of patterns, right? I don't have the affidavit right in front of me, but I can tell you that in the ADA's affirmation, he represented to the judge that there were multiple, the term was multiple calls over a multiple-week period, which was simply untrue. So you have this shifting narrative as to what constitutes a pattern. Right. But we're correcting the affidavit, so forget about the multiple calls. And you stick with what was testified, at least for this part. And as Judge Bianco pointed out, to me, what's significant is the guy says, you have 100 to give me, and everyone knows what they're talking about. And why isn't that enough? Here's what's troubling to me. I mean, number one, let's keep in mind, we don't have a recording of this. So we don't know verbatim the tone of what happened. We don't know how this played out. And certainly, you know, courts are allowed to defer to an agent's interpretation of narcotics codes. But what's so noteworthy here is the defendant, in this case, never speaks in a code. It's the agent who speaks in a code. What we have is basically an agent making a cold call to a person. He has no idea who it is. He's speaking in Spanish, number one, a foreign language, and he makes reference to having 100 to give him and wanting to meet him. There's no definite agreement to meet, right? There's this sort of response that I'm out of town right now. Mr. Judge, here's the testimony. The testimony has, certainly has, misgivings about the original affidavit and then concludes that there's enough. I mean, why do we not give that deference? She concludes that there's enough based on a number of factors that were not in front of the issuing magistrate, including this new interpretation of a pattern of calls and also the 614 number, as you mentioned. She says, actually, in the hearing, well, you know what, that's a lot more persuasive than anything else that's been presented. So clearly, that played an important part of the judge's decision. What we are really left with is a call that is intentionally ambiguous. It's created to have ambiguity, and ambiguity is created by the agent. He's calling up someone he doesn't know, speaking in strange terms. The call cannot last for more than a minute before it's terminated. Alitono, let me ask you about your second point. If let's assume the government didn't have the benefit of the fruits of the order or the search that followed of the car, right? The arrest and search. Sure. They still would have gotten on Mr. Stern's phone. They had pages and pages in their Title III application establishing probable cause for his phone, right? They did. So they would have gotten on his phone anyway. Right. Okay. And then they would have gotten on Mr. Powell's phone as well, right? And the difficulty is — Hold on. Just yes or no. I'll bear with you. Would they have gotten on Mr. Powell's phone independent? Based upon the Stern phone, they would have gotten on the Powell phone. Well, I don't know what was presented with respect to the Powell phone. That wire went up under the auspices of Jamaican authority, and that paperwork was never presented in court. So we don't know exactly how the Powell wiretap came about. But clearly there was enough to get a wiretap up on the Stern phone. And your client was intercepted both on the Stern phone and on the Powell phone, right, that led to the subsequent — As far as the Stern — when you look at the first wiretap application for my client's phone, there are no references to any incriminating conversations he has on the Stern wiretap. It's noted that there is a single instance where he shows up at Stern's place of business, which is also a jewelry store. So that was really all they had as far as a connection with Stern goes. The real incriminating evidence comes when they obtained the Jamaican wiretaps and the Powell conversations. But what is so critical is they could never have tied that — those Powell wiretaps to my client without the traffic stop, because it's the 3271 number, right? During the traffic stop, they uncover the second cell phone of the client's, which is the 3271 number. Wait a second. As soon as they found out about the 3271 number, apart from the stop of your client, they could have gotten — they certainly had enough at that point to do the geolocation order. They would have certainly found out who your client was, right? But — There was nothing that would have prevented them from just doing that order a few weeks later and getting the exact same information. But that in itself is the fruits, right? Their information that he possesses and uses that 3271 number is in itself a fruit of the unlawful GPS order, right? The government would have never come by the information that he possessed and used that phone. They would have intercepted him on the Stern line. They would have intercepted him on the Powell line.  sources is what I'm suggesting to you. Well, I mean, if we're saying that the government eventually would have tracked the 3271 number back to the client, we should be clear that we are talking about the inevitable discovery doctrine here, right? The government says Ng doesn't apply, that this is not an inevitable discovery case, but it very much is an inevitable discovery case, because what the government is saying, what the Court is suggesting, is that sooner or later — Not sooner or later. The Stern wiretap was weeks. It was in March, right? It wasn't like months and months later that they went up on Stern's phone in March, right? Right. They're up on Stern's phone. But again, my recollection is, based on what I saw on the record and based on the application for Marley's wiretap, is that there was nothing facially incriminating about his conversations with Stern. At best, they had a phone call going on with Stern, and apparently he showed up at Stern's place of business. So I don't know that it follows that inevitably the government would have obtained a geolocation order on the 3271 phone based on what was overheard on the Stern wiretap. I frankly have not seen that in the record. Thank you. Thank you. We'll hear from McGovern. Good morning, Your Honors, and may it please the Court. My name is David Abramowitz. I represent the United States on this appeal. I also represented the United States during the suppression portion of the proceedings below. The judgment should be affirmed. Even before reaching what Mr. Bresendon identified as his two core arguments, the supplemental information and the, I guess, fruits of the poisonous tree issue, there's grounds to affirm, as Judge Bianco identified. The after-misstatements in the ADA affidavit were corrected to reflect the district factual findings from the Franks hearing, and before omitted information was added, that affidavit set forth probable cause. There was an undercover agent who called this 4484 phone. The caller, who was trained and experienced in these investigations, used coded language that a money launderer would understand. And in response, the user of the 4484 phone arranged to meet in New York City. Moreover, that 4484 phone had been in contact with the phone of a known money launderer, and the pattern of those contacts, based on the analysis of another agent who was trained in these types of investigations and these types of call activities, was suspicious. Those factual findings were not clearly erroneous, and those factual findings support the finding that there was probable cause. Nothing else is required to resolve the Franks issue. Well, what do you have besides the I have 100 for you? The — besides the I have 100 for you, you have the contacts between the 4484 phone and the money launderer's phone, and you have the response to the I have 100 for you, which is not what are you talking about, but which is, okay, I'll meet you in New York City. That's highly suspicious. Of course, when you add the additional info, the supplemental info, there's even more — there are even more grounds to support the probable cause finding. But we're not considering the supplemental info. The Court does not need to consider it. The Court may consider it under its own — under its precedents. Alitala would control on that, though, right? I mean, Alitala couldn't have stated more clearly that you're not supposed to go outside the act of David, right? How could we possibly consider that in light of Alitala? Because other cases before and after Alitala have stated just as clearly — The President pointed out in his reply that all of those cases, the issue was good faith or something to do with the mental state of the law enforcement officer and not on the issue of whether or not there was probable cause absent the information. Which one of those cases dealt with this issue, whether or not removing the tainted — the tainted information would still allow for probable cause? I think all those, he's correct, involve mental state issues, right? No, I disagree, Your Honor. Which one? Which one? Which one of the ones you cite did not involve a good faith determination or some other mental state of the agent? They involved qualified immunity, which is a multi-step analysis. The first step of that is to determine whether a constitutional violation occurred. Later steps, to be sure, do look at the intent of the agents who are being sued. But the first step is, was there a constitutional violation? That's the same question we were faced with here. Was there a Fourth Amendment violation? And in looking at that step, the same analysis transfers over. It's a — I don't think that's a — just because a test involves an objective element and a mental state element doesn't mean that any of those cases were deciding them based upon the objective element. It seemed that they were all deciding them based upon the mental state element under the qualified immunity issue, that the officers were still operating in good faith, essentially, and therefore had qualified immunity, right? Which one of those cases in that context did what you're suggesting, which is say, for purposes of establishing probable cause, we're going to consider the evidence outside the affidavit? I don't think any of them did. Roger Ruttenham, it was not probable cause. They were looking at necessity. But they were looking at — it was a Franks framework to look at necessity. And they were looking at whether there was — whether these misstatements under the Franks analysis affected the necessity finding. And there was clear language there that it was permissible to consider the supplemental information that — that was correct after the Franks hearing. On appeal, though, we really decided it on different grounds, right? I understand that was what the district court did, but on — before the circuit, we decided it on alternative grounds, right? Not — But I mean — We didn't necessarily endorse the consideration of the supplemental information, right? I believe in the — in the circuit court's ruling, though, there was — there was language — Even if language in there. Yes. It said that the court must insert the omitted truths revealed at the suppression hearing. That was at 719F3rd of page 146. That's language from the Second Circuit opinion. And that's exactly what happened here. Again, it is our position that we don't need to get to these supplemental facts to look at probable cause. And as — The problem was you started to rely on them. And so now we're down that road. Right. So if, you know, without the supplemental facts, there's enough. That's your position. That's — that is our — that is our position, yes. Fortunately enough, you think there is — let's assume for the moment that it was not proper to rely on this — the supplemental information, other than — in the case of the I've Got 100, what — tell me what else you think there was. There was the I've Got 100. There was the officer's training and experience, which showed that I've Got 100 is code that a money launderer would understand. And it is proper in the probable cause context to rely on that sort of training and experience. And there were the contacts — I'm sorry, and there was the response of the 4484 phone's user to that coded language. And there were the contacts between the 4484 phone and the phone of the money launderer. That is all the — that is enough for probable cause. There's no need to refute every single possible innocent explanation that can be offered for all of those facts. That's probable cause to believe what? To believe that the user of this phone and that getting geolocation information will lead to evidence of money laundering or possibly drug trafficking. Let me ask you to — Mr. Brisseton said that the Stern wiretaps did not really yield any incriminating evidence of his client on this issue of, you know, inevitable discovery or independent evidence. Can you respond to that? He said it just — all there was was him being at the house of Mr. Stern. Can you address that? Yes, Your Honor. So there were contacts between Mr. Marley's other phone, the 3271 phone, and Stern's phone that were captured on the wiretap. On two occasions — this came out during the — during the hearing — on two occasions, Mr. Marley drove the same Nissan Maxima that was pulled over in February. He drove that in March to visit with Stern, kind of ran in quickly each time, and then ran out. He was under surveillance because the agents had intercepted these calls and had heard the meeting being set up. So that's not kind of the conduct you would expect from someone who's just visiting a jewelry store to kind of set up this meeting in advance, run in, and then run out. How do we know that the Powell wiretap, the Jamaican wiretap, would have happened independent of any fruits from either the February order or the search of the car? So for the Powell wiretap, the Jamaican authorities went up on that. There was a — the U.S. authorities provided them information that were obtained from the Stern wiretap that just showed Stern and Powell having these incriminating conversations. That has nothing to do with, obviously, what happened in February. I cannot say exactly what was submitted to the — to the Jamaican authorities because we don't have their process. It's a foreign process. But — and then from those Powell wiretaps, there were multiple calls with Mr. Marley that, in turn, led to the wiretaps on Mr. Marley's I would like to say on this point about independent source, it's really also an attenuation point. Mr. Bresendon has made a lot, at least in the papers, about this case Murray. And it is Murray that notes that the exclusionary rule extends, quote, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint. And that is what happened here. It cannot be the case that Mr. Marley, based on something that happened in February 2015, where he was identified, then had sort of free reign to commit crimes from February through April 2016. That was the conspiracy he was charged with. Those were the dates, February 2015 to April 2016. It can't be the case that the DEA was required to sort of purge any memory of Mr. Marley and his identity from their head while he continued to commit a series of crimes, and they continued to gather evidence that they would have gathered no matter what. Unless the panel has questions, I'll rest on the submission. Roberts. Thank you. We'll hear the rebuttal. Obviously, I'm not suggesting that Mr. Marley was entitled to lifelong immunity, but that's not the fact pattern here. The fact pattern we're talking about is the government, starting with Mr. Marley being an unknown entity, and through their illegal conduct, learning who he was, and basically him coming on to their radar screen, and then as part of an uninterrupted investigation by the same agents who were engaged in the initial unlawful gathering of information, they build a case against him. This court said in United States v. Eng that when a criminal investigation is triggered by the initial collection, the initial unlawful collection of information, that investigation itself is tainted. Now, in the 28 J letters that were submitted to the Court, the government has said Eng doesn't even apply to this case, or it applies not to downstream evidence, has been the argument, not to derivative evidence, but only to the original fruit of the illegal conduct, which the government says in this case is basically the GPS coordinates. But the government's wrong for two reasons about that, and I would invite the Court to go back and look at Eng, because Eng very much involved downstream and derivative evidence. No, but even if Eng applied exactly this situation, it wasn't as if they didn't know anything about your client's activity before the order. They were looking at your client. That was the whole reason for the undercover call. They may not have known his identity, who he was, but they were certainly pursuing him already before the order. So the order didn't trigger them looking at your client. They were already looking at your client. They just didn't know his identity, right? Well, they knew a phone number he was using had contacted a money launder on four occasions. And they had a conversation with him, too. They did. They did. But the order didn't trigger him. It didn't trigger the investigation of him. Well, I would argue that until they've identified who he is, that there is no — there can be no real investigation into Mr. Marley. But I would say that the government — not only has the government not shown that there was a contemporaneous investigation, right, which is one of the requirements under Eng, but this Court has been very clear that when we're talking about inevitable discovery, they have a very specific burden to show with respect to each piece of evidence that they would have inevitably — not hypothetically, but inevitably would have come upon that evidence. And that includes — so in this case, part of the fruits of what they obtained when they — when they conduct this stop is not — it's not just the GPS tracking data. They didn't care about whether he turned left on Main Street. They wanted to know who he was, and they wanted to get — what they got, the most important thing they got was his other phone number. And that phone number is what allows — what gives significance to the Powell conversations. The Powell conversations are the — really the implicating piece of evidence here, and the government never would have been able to tie that to my client but for that traffic stop. And so that's my argument here. Thank you. Thank you. Well-preserved decision.